IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MARILYN TOLIVER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 14 C 3049 |
| v. | ) |
| | ) Magistrate Judge Sidney I. Schenkier |
| CAROLYN W. COLVIN, Acting | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff Marilyn Toliver has filed a motion to reverse and remand the Commissioner's decision denying her claim for disability and disability insurance benefits (doc. # 14), and the Commissioner has filed a cross-motion for summary judgment, asking the Court to affirm (doc. #22). For the reasons set forth below, we grant Ms. Toliver's motion and deny the Commissioner's motion.

I.

We address the evidence and the Administrative Law Judge's ("ALJ's") opinion separately below.

A.

Ms. Toliver claims that she became disabled on September 3, 2010. She suffers from type II diabetes and hypertension (high blood pressure), and in 2010 and 2011 she sought treatment several times for symptoms related to uncontrolled blood sugar and high blood pressure, including headache, fatigue and blurred vision (R. 228-29, 283, 301). Her symptoms often arose when she stopped taking her medications, and her blood sugar and symptoms generally stabilized

---

[1]On June 20, 2014, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to the Court for all proceedings, including entry of final judgment (doc. # 12).

after she received medication (R. 283, 330, 409). But, at times, her blood pressure has stayed elevated even when she has been compliant with her medications (R. 485). At her hearing before the ALJ on August 9, 2012, Ms. Toliver testified that she takes medication for her diabetes and blood pressure daily, but that she still has "good days and bad days" and either her blood pressure or sugar is too high every time she goes to the doctor (R. 42). She "dread[s]" taking her medications, and she usually has "pretty bad days" after her doctors change them (R. 47, 49).

Ms. Toliver also suffered from impaired vision in 2011 and early 2012, and she had surgery to remove bilateral cataracts in March and April 2012 (R. 395, 473, 476-78). At the August 2012 hearing, she testified that her vision improved after surgery, but she still uses reading glasses and sees a ring around the outside of her vision (R. 43-44).

Ms. Toliver has also complained of shoulder pain, which a November 2011 x-ray indicated could be caused by degeneration due to arthritis (R. 399, 416, 515). At the hearing, she testified that she has trouble sleeping due to pain and can only lift the weight of a cat; however, she does laundry, cleans and prepares meals once a week and shoots pool occasionally (R. 44, 46). Ms. Toliver also testified that she cannot stand very long or walk more than a block (R. 44); she has had problems with her legs and ankle swelling since her heart attack (R. 49).

On April 12, 2011, a non-examining DDS state agency examiner reviewed Ms. Toliver's medical records and opined that she could frequently lift ten pounds and occasionally lift twenty pounds; could stand or walk with normal breaks for about six hours out of an eight-hour workday; and should avoid exposure to temperature extremes and hazards (R. 59-62). On September 5, 2011, another non-examining DDS state agency examiner agreed with this residual functional capacity ("RFC") assessment, but also concluded that Ms. Toliver should never climb

2

ladders, ropes, or scaffolds and should only occasionally climb ramps or stairs, stoop, kneel, crouch, or crawl (R. 373).

On June 30, 2011, Ms. Toliver was diagnosed with dysuria (painful or burning with urination) with frequency (R. 405-06). During doctor's visits from January through July 2012, Ms. Toliver complained multiple times of frequent urination, nocturia (frequent urination during the night) and polyuria (excretion of large amounts of urine); and she was prescribed Toviaz to treat these symptoms of overactive bladder (R. 384-86, 482, 514). She refused to take hydrochlorothiazide to treat her high blood pressure because it increased her urination, and she reported suffering from insomnia because her frequent urination prevents her from sleeping more than two hours during the night (R. 485-86). At the August 2012 hearing, Ms. Toliver testified that she "urinate[s] every 10 or 15 minutes" and that she has to urinate every two hours during the night (R. 44, 47, 51).

On January 24, 2012, Ms. Toliver suffered a heart attack with occlusion of the left anterior descending artery, and she was treated with angioplasty and placement of a stent (R. 448-54). On February 10, 2012, she complained of chest pain and palpitations, but her doctor found no significant valvular or ventricular abnormalities (R. 432-43). By summer 2012, although she reported chest pain, Ms. Toliver's condition was stable, and her heart had returned to normal size with only mild enlargement of her left atrium (R. 490, 496-97, 509-10, 544). In July 2012, doctors attributed Ms. Toliver's complaints of upper abdominal pain and nausea to digestive problems (gastroparesis, gastritis and gastroesophageal reflux disease), and she had excellent response to therapy (R. 530, 533, 543, 557).

The vocational expert ("VE") testified at the hearing that an individual who could perform light work, but who could only occasionally stoop, kneel, crouch, crawl, and reach

3

overhead with the left upper extremity could perform Ms. Toliver's past relevant work as a convenience store manager (R. 53-54). However, the VE stated that the job is SVP 7, which takes four years to learn (R. 55).[2] In response to Ms. Toliver's attorney's question as to whether Ms. Toliver had learned that job after doing it for only two and one-half years, the VE responded, "No" (*Id.*). In response to a follow-up question by the ALJ, the VE clarified that a job of SVP 7 needs two years, up to and including four years, to gain proficiency (*Id.*). The VE's testimony ended at that point.

**B.**

In his September 20, 2012, opinion denying benefits, the ALJ applied the required five-step inquiry described in 20 C.F.R. § 404.1520(a) (R. 21-26). At Step 1, the ALJ found that Ms. Toliver had not engaged in substantial gainful activity since her alleged onset date of September 3, 2010 (R. 21). At Step 2, he found that Ms. Toliver had the following severe impairments: diabetes mellitus, hypertension, coronary artery disease, left shoulder osteoarthritis and obesity (*Id.*). The ALJ found that Ms. Toliver's visual impairment was not severe after her cataract surgery and that her hyperthyroidism had no more than minimal impact on her ability to perform basic work activities (*Id.*).

At Step 3, the ALJ concluded that Ms. Toliver's impairments, alone or in combination, did not meet or equal the severity of Listings 1.02 (major joint dysfunction) or 4.04 (heart disease) (R. 22). The ALJ then determined that Ms. Toliver had the RFC "to perform less than the full range of light work" (*Id.*). Specifically, the ALJ found that Ms. Toliver can frequently lift or carry ten pounds and occasionally lift twenty pounds; sit, stand, or walk for approximately six

---

[2]SVP, or "specific vocational preparation" is defined in Appendix C of the DOT as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. This training may be acquired in a school, work, military, institutional, or vocational environment." U.S. Dep't of Labor, Dictionary of Occupational Titles, App. C (4th Ed., Rev. 1991).

hours in an eight-hour workday with normal breaks; occasionally climb ramps or stairs, but never ladders, ropes, or scaffolds; frequently balance; and occasionally stoop, kneel, crouch, crawl and reach overhead with her left upper extremity (*Id*). Further, she must avoid concentrated exposure to extreme temperatures and pulmonary irritants and should avoid all exposure to workplace hazards (*Id*).

The ALJ determined that Ms. Toliver's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, [her] statements concerning the intensity, persistence and limiting effects of these symptoms are not fully credible" (R. 24). He noted that Ms. Toliver had type II diabetes, and that she has occasionally been treated for problems related to uncontrolled diabetes (R. 23). However, the ALJ found that in these instances, Ms. Toliver had not been following her prescribed treatment, and once she went back on her medications, her blood sugar was controlled and her symptoms went away (*Id.*). Moreover, the ALJ stated that Ms. Toliver testified that her diabetes was "a lot better than it was" (*Id.*). The ALJ concluded that Ms. Toliver's diabetes was "generally well controlled by medications, that is, when [she] takes her medications as prescribed" (*Id.*).

The ALJ also noted that since April 2010, there have been multiple instances where Ms. Toliver has sought treatment for symptoms associated with high blood pressure (R. 23). As with diabetes, the ALJ found that Ms. Toliver's problems associated with high blood pressure were attributable to her failure to comply with taking her medication, and that her blood pressure was controlled with medication (R. 24). Moreover, Ms. Toliver continued to smoke despite her heart attack and high blood pressure (*Id.*). The ALJ opined that Ms. Toliver's failure to adhere to her medication regimen, combined with her continued smoking, suggests that she does not feel her symptoms are as limiting as she alleges (*Id.*).

The ALJ also addressed Ms. Toliver's testimony that her diabetes causes her to wake up to urinate about every two hours throughout the night, and to urinate every ten to fifteen minutes during the day (R. 25). The ALJ concluded that "[t]he objective medical records do not provide any evidence to support the claimant's allegation that she is almost constantly in the bathroom" (*Id.*). In addition, the ALJ stated that "there is no record of the claimant seeking treatment for frequent urination, no diagnosis by anyone who has treated her, and no treatment prescribed to remedy the problem" (*Id.*).

Regarding her left shoulder, the ALJ found that Ms. Toliver's complaints that her shoulder pain prevents her from lifting significant weight or doing much during the day were inconsistent with a mostly normal X-ray of her shoulder and her daily activities (R. 24-25). The ALJ stated that Ms. Toliver testified that "she does her own cooking, cleaning, and laundry. She also feeds herself, does chores, and occasionally shoots pool" (R. 25). The ALJ concluded that these activities were inconsistent with her allegation that she cannot lift more than a cat (*Id.*).

In addition, the ALJ found no indication that Ms. Toliver's cardiac condition would limit her to only mild exertion because following her cardiac catheterization in January 2012, she did not experience further cardiac symptoms (R. 25). The ALJ gave "little weight" to a heart evaluation on March 8, 2012 stating that Ms. Toliver had a mild limitation on activity, because it was done just a little over one month after Ms. Toliver's heart attack, suggesting that the restrictions were only meant to be temporary (*Id.*). The ALJ also calculated Ms. Toliver's Body Mass Index ("BMI") as 33, which reflects obesity (R. 24). The ALJ stated that her obesity prevents her from performing work at a greater exertional level than set forth in her RFC (*Id.*).

Ultimately, the ALJ gave "great weight" to the state agency medical consultants' opinions that Ms. Toliver could perform light work subject to various non-exertional limitations

because he found that they were supported by the medical evidence (R. 25). The ALJ stated that the VE testified that an individual with Ms. Toliver's age, education, past relevant work experience and RFC could perform her past relevant work as a convenience store manager (R. 26). The ALJ then concluded that Ms. Toliver could perform her past relevant work as a convenience store manager because according to the Dictionary of Occupational Titles ("DOT"), it takes two to four years to gain proficiency in this job, and the ALJ stated that Ms. Toliver gained the necessary experience when she worked as a convenience store manager from 2001 through 2003 (*Id.*). The ALJ concluded his analysis at that point, and did not determine at Step 5 whether there were other jobs in the economy that Ms. Toliver could perform with the RFC assigned by the ALJ.

## II.

"We review the ALJ's decision deferentially only to determine if it is supported by substantial evidence, which [has been] described as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Yurt v. Colvin*, 758 F.3d 850, 856 (7th Cir. 2014) (internal citations and quotations omitted). "Although we will not reweigh the evidence or substitute our own judgment for that of the ALJ, we will examine the ALJ's decision to determine whether it reflects a logical bridge from the evidence to the conclusions sufficient to allow us, as a reviewing court, to assess the validity of the agency's ultimate findings and afford [the claimant] meaningful judicial review." *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014).

Ms. Toliver contends that remand is warranted because (1) the ALJ erred at Step 4 in finding that Ms. Toliver could perform a job that does not qualify as past relevant work; (2) the RFC was erroneous because it did not account for Ms. Toliver's problems with frequent

urination; and (3) the ALJ's adverse credibility determination put excessive weight on Ms. Toliver's daily activities, non-compliance with medications and smoking (doc. # 15: Pl.'s Mem. at 6; doc. # 25: Pl.'s Reply at 5-8). For the reasons stated below, we agree that certain errors in the ALJ's opinion require remand.

### A.

The ALJ determined at Step 4 that Ms. Toliver was capable of performing her past relevant work as a convenience store manager (R. 25). "Past relevant work is work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it." 20 C.F.R. § 404.1560(b)(1). The regulations state that an ALJ may use the services of a VE to obtain evidence to help determine whether a claimant can perform her past relevant work. *Id.*

In this case, the ALJ invited the VE to testify as to Ms. Toliver's ability to perform her past relevant work as a convenience store manager. As explained above, in response to a question by Ms. Toliver's attorney, the VE testified that a person has to work at a job that is SVP 7 for four years to learn it (R. 55). The VE then responded "No" to the attorney's question of whether Ms. Toliver learned the job of convenience store manager if -- as the evidence established -- she worked in that job for only two and one-half years (*Id.*). The ALJ wrapped up the VE's testimony with a question asking whether "SVP is two to four years for proficiency," to which the VE responded, "[t]wo years, up to and including four years" (*Id.*). The VE never recanted his testimony that Ms. Toliver had not learned the position as a result of working in the position for only two and one-half years.

Yet, in his opinion, the ALJ stated only that the VE testified that "a hypothetical individual of the claimant's age, education, past relevant work experience, and residual

8

functional capacity" could perform Ms. Toliver's past relevant work as a convenience store manager (R. 26). The ALJ did not address the VE's testimony that since Ms. Toliver was a convenience store manager for only two and one-half years, she did not learn the job.

This was a serious error that plainly requires a remand. "Having elicited the testimony of a vocational expert, the ALJ was not entitled to simply ignore significant portions of it." *Griffin v. Massanari*, No. 00 C 7109, 2001 WL 1064476, at *10 (N.D. Ill. Sept. 13, 2001). *See also Cuevas v. Barnhart*, No. 02-4336, 2004 WL 1588277, at *15 (N.D. Ill. July 14, 2004) (rule that ALJ may not ignore evidence that is contrary to his ultimate conclusion "is especially true when [ALJ] solicits the testimony and opinions of a VE at step 5, and then disregards this testimony without any explanation") (quoting *Sayles v. Barnhart*, No. 00-7200, 2001 WL 1568850, at *9 (N.D. Ill. Dec. 7, 2001)).

This Court has decided at least two cases that raised a similar Step 4 issue. In *Hudson v. Astrue*, we reversed and remanded the opinion of an ALJ that found the plaintiff was able to perform her prior work as a receptionist/switchboard operator "without explaining -- or even acknowledging -- the contrary opinion of [the] VE." *Hudson v. Astrue*, No. 08-3242, 2009 WL 2612528, at *13 (N.D. Ill. Jan. 29, 2009). Similarly, in *Reindl v. Astrue*, we reversed and remanded where the ALJ ignored the VE's testimony on cross examination that the claimant would not be able to perform her past relevant work under certain conditions. *Reindl v. Astrue*, No. 09-2695, 2010 WL 2893611, at *12 (N.D. Ill. July 22, 2010).

The ALJ in this case committed the same error as did the ALJs in *Hudson* and *Reindl*. "The ALJ was obliged to come to grips with th[e] contrary evidence [from the VE], and was not at liberty to simply ignore it." *Hudson*, 2009 WL 2612528, at *13. The Commissioner contends that because the DOT states that jobs of SVP 7 require two to four years of experience or

9

training, and Ms. Toliver did not present evidence that she did not learn the job in two and one-half years, the ALJ did not err in deciding that Ms. Toliver could perform her past relevant work (Def.'s Mot. at 5). We do not pass on the merit (if any) of that *post hoc* explanation for the ALJ's decision, which runs afoul of the *Chenery* doctrine, *S.E.C. v. Chenery Corp.*, 318 U.S. 80 (1943), because the ALJ himself offered no explanation as to why he disregarded the VE's testimony that Ms. Toliver did not learn the job of convenience store manager. We conclude, as we did in *Hudson* and *Reindl*, that "the ALJ's handling of this point falls short of meeting the minimum articulation standard." *Hudson*, 2009 WL 2612528, at *13.

Because the ALJ ended his analysis at Step 4 after finding that Ms. Toliver could perform her past relevant work, the ALJ made no alternative finding of jobs that Ms. Toliver could perform. "Had the ALJ conducted a step-five analysis to determine whether [Ms. Toliver] could perform other jobs in the national economy, the error might be harmless. Nevertheless, he did not to do so here, and we cannot fill that gap." *Getch v. Astrue*, 539 F.3d 473, 481-82 (7th Cir. 2008). Thus, we must remand this case for further consideration.

**B.**

Although we remand due to errors in the ALJ's Step 4 determination, we note at least two other areas the ALJ should also reexamine on remand. *First*, the ALJ's finding that "there is no record of the claimant seeking treatment for frequent urination, no diagnosis by anyone who has treated her, and no treatment prescribed to remedy the problem" (R. 25) misstates the evidence in the record. The medical records include not only Ms. Toliver's reports of frequent and painful urination, but also a diagnosis of overactive bladder and a prescription to treat this condition (*see* R. 384-86, 482, 514). Although this evidence may not convince the ALJ on remand that Ms. Toliver's bladder issues would require additional limitations in her RFC or render her disabled,

the ALJ must consider this evidence. *See Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009) (holding that remand was warranted where the ALJ failed to consider the impact on the claimant's functional limitations from her urinary disorders because "[a]lthough these impairments may not on their own be disabling[,] . . . [a]n ALJ must consider the combined effects of all of the claimant's impairments, even those that would not be considered severe in isolation").[3]

*Second*, the ALJ should revisit his credibility determination on remand. In finding Ms. Toliver's allegations not credible, the ALJ relied in part on her non-compliance with her medications. However, the ALJ did not consider Ms. Toliver's reasons for not taking her medication before making the adverse credibility determination. Although the failure to follow a treatment plan can undermine a claimant's credibility, an ALJ must explore whether the claimant had "good reasons" for not fully complying with prescribed treatment before drawing a negative inference." *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012); *see also Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014). Good reasons may include "an inability to afford treatment, ineffectiveness of further treatment, or intolerable side effects." *Shauger*, 675 F.3d at 696. In this case, Ms. Toliver testified that she "dread[s]" taking her medications, and she usually has "pretty bad days" after her doctors change them (R. 47, 49). She also would not take hydrochlorothiazide to treat her high blood pressure because it increased the frequency of her urination (R. 485-86). Before concluding that Ms. Toliver's non-compliance with her medications showed that her symptoms were not as disabling as she alleged, the ALJ should

---

[3]As part of that assessment, the ALJ might consider inquiring of Ms. Toliver as to whether she *literally* meant that she frequents the bathroom every ten to fifteen minutes, or whether she used that as shorthand to mean that she frequents the bathroom very often -- just as when a person says "I'll be there in a minute," she often does not literally mean that she will arrive in sixty seconds, but rather, that she will arrive shortly.

11

have considered Ms. Toliver's reasons for not taking her medications. On remand, the ALJ will have a chance to do so.

## CONCLUSION

For the reasons stated above, we grant Ms. Toliver's motion to remand (doc. #14) and deny the Commissioner's motion for summary judgment (doc. #22). The case is remanded for further proceedings consistent with this opinion. The case is terminated.

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

DATE: August 3, 2015